IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>**Ultimate Escapes Holdings, LLC, *et al.,***<br><br>Debtors. | Chapter 11<br><br>Case No. 10-12915 (BLS)<br><br>(Jointly Administered) |
| **Edward T. Gavin, Trustee of the UE Liquidating Trust, on behalf of the Estates of Ultimate Escapes Holdings, LLC, *et al.,***<br><br>Plaintiff,<br><br>v.<br><br>**James M. Tousignant and Richard Keith,**<br><br>Defendants. | Adv. No. 12-50849 (BLS)<br><br>Related to Adv. Docket No. 1, 8, 68, 167, 201, 205 |

POLSINELLI, PC
Todd H. Bartels, Esq.
Shanti M. Katona, Esq.
Christopher A. Ward, Esq.
222 Delaware Avenue, Suite 1101
Wilmington, DE 19801

*Counsel for Edward T. Gavin, Trustee of the UE Liquidating Trust, on behalf of the Estates of Ultimate Escapes Holdings, LLC,* et al.

WHITE AND WILLIAMS, LLP
Marc S. Casarino, Esq.
Michael N. Onufrak, Esq.
824 North Market, Suite 902
Wilmington, DE 19801

*Counsel for James M. Tousignant*

REGER, RIZZO, & DARNALL, LLP
John J. Barrett, Jr.
Arthur D. Kuhl, Esq.
Louis J. Rizzo, Jr., Esq.
1523 Concord Pike, Suite 200
Wilmington, DE 19803

*Counsel for Richard Keith*

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO 28 U.S.C. § 157(c)(1) AND FED. R. BANKR. P. 9033(a)

Before the Court is the Complaint [Adv. Docket No. 1] filed by Edward T. Gavin, Trustee of the UE Liquidating Trust, on behalf of the Estates of Ultimate Escapes Holdings, LLC ("Ultimate Escapes"), *et al.*[1] The Complaint states a claim for breach of fiduciary duty against Ultimate Escapes' former officer and director James M. Tousignant and former director Richard Keith (the "Defendants"). The Trustee contends that the Defendants breached their fiduciary duties of loyalty and care when they entered into an agreement between Ultimate Escapes and Club Holdings, LLC ("Club Holdings") dated August 6, 2010 (the "August 6th Agreement") that, as the Trustee argues, essentially transferred Ultimate Escapes' member list, a multi-million dollar asset and the putative "crown jewel" of the company, to Club Holdings for a mere $115,000. Following a trial, the Court finds that the August 6th Agreement only intended for the transfer of member information for the limited purpose of converting approximately thirty (30) Ultimate Escapes' members to Club Holdings. Furthermore, the Court finds that the Mr. Tousignant's actions in negotiating and executing the August 6th Agreement are protected by the business judgment rule, and that there is no evidence that Mr. Keith participated in or was aware of the specifics of the August 6th Agreement. Finally, the Court finds that the Trustee has neither articulated nor proven any breach of the Defendants' duty of loyalty. The Court recommends that judgment be entered in favor of the Defendants and against the Trustee.

## I. BACKGROUND

### A.    The Debtors

Ultimate Escapes and various affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 on September 20 and 23, 2010. Ultimate Escapes was a luxury destination club providing members with access to high-end vacation residences in resort and metropolitan locations throughout the United States, the Caribbean,

---

[1] *See* Exhibit 1 to the Debtors' confirmed plan of reorganization [Adv. Docket No. 936] for a list of the Debtors in this case.

Mexico, and Europe. Members gained access to the vacation properties and travel services by entering into membership agreements, which involved a one-time initiation fee ranging from $100,000 to $300,000 and annual membership dues ranging from $5,000 to over $30,000. There could also be "ad hoc fees" for add-on services, such as ski lift tickets or a personal chef. The combination of initiation fees, membership dues, and ad hoc fees was Ultimate Escapes' primary source of revenue. Through its various membership packages, Ultimate Escapes had about 1,250 members in 2010.

Prior to the commencement of these cases, Mr. Tousignant served as Ultimate Escapes' President and Chief Executive Officer, as well as a member of its board of directors. Mr. Keith served as Chairman of the Board. In addition to Mr. Tousignant and Mr. Keith, the Ultimate Escapes Board also included C. Thomas McMillen, Mark A. Frantz, and Stephen Griessel (the "Outside Directors").

Ultimate Escapes was formed in September 2009 when Mr. Tousignant and Mr. Keith combined their previous vacation resort enterprises into one company. Ultimate Escapes was a publicly traded company organized under the laws of Delaware as a limited liability company. Its principal place of business was in Kissimmee, Florida.

The Debtors' principal lender was CapitalSource, Inc. ("CapSource"), who provided a revolving loan secured by most of Ultimate Escapes' real estate properties and intangible assets. One of the intangible assets securing the loan was Ultimate Escapes' proprietary database of club members' information (the "Membership List"). Mr. Tousignant and Mr. Keith also each personally guaranteed the loan. As of June 30, 2010, the balance on the CapSource loan was $89.8 million.

## B. The Merger Negotiations with Club Holdings

In early 2010 (less than six months after its creation), Ultimate Escapes began formally exploring the possibility of merging with one of its major competitors, Club Holdings. The luxury destination club industry had suffered in the years following the economic crisis and downturn in the real estate market, and management viewed consolidation as a strategy to stay afloat through difficult times.

On March 1, 2010, Ultimate Escapes entered into a Mutual Confidentiality Agreement (the "Confidentiality Agreement")[2] with Club Holdings. Pursuant to the Confidentiality Agreement, Ultimate Escapes and Club Holdings commenced due diligence and agreed to exchange confidential business information, including their respective "member lists and information" for the exclusive purpose of evaluating a possible merger. On April 30, 2010, Ultimate Escapes and Club Holdings executed a confidential letter of intent (the "Letter of Intent"),[3] which proposed a transfer to Ultimate Escapes of the assets and liabilities of Club Holdings in exchange for an equity interest in Ultimate Escapes. Together, these documents bound the parties to keep the terms of the contemplated transaction confidential.

As spring 2010 transitioned into summer, the Ultimate Escapes Board viewed a merger with Club Holdings as the best route forward. The Board adopted a resolution on June 10, 2010, that "the company and Mr. Tousignant as CEO is authorized to proceed to finalize and execute the contribution agreement for Project Bond [the merger with Club Holdings], with the signatures to be held in attorney escrow."[4]

As the primary secured lender to both Ultimate Escapes and Club Holdings, CapSource's approval was essential because the planned merger would require each company's debt to be restructured. CapSource initially appeared to be in support of the merger as numerous term sheets were exchanged among Ultimate Escapes, Club Holdings, and CapSource.[5] The parties were in the thick of negotiating a deal as August 6 approached.

---

[2] Ex. P-24.

[3] Ex. P-25.

[4] Ex. D-109.

[5] Ex. D-68 (July 30, 2014 email from CapSource to Mr. Tousignant and Pete Estler, Club Holdings CEO, containing a draft term sheet for "the consolidation, extension and long term renewal" of both company's credit facilities); Ex. D-71 (Aug. 2, 2010, email to Mr. Tousignant, Mr. Estler, and another individual containing an updated term sheet); Ex. D-138 (Aug. 4, 2014 email to Mr. Tousignant and Mr. Preiser containing another revised term sheet).

## C. Liquidity Crisis

In late spring 2010, Ultimate Escapes entered into a factoring agreement with Monterey Financial Services, under which Ultimate Escapes agreed to repay Monterey Financial Services $2 million from its receivables in exchange for a cash advance. During the summer months, certain cash shortfalls were covered by personal advances from Mr. Tousignant and Mr. Keith as they attempted to keep the company alive long enough to close the merger with Club Holdings. Mr. Keith contributed $100,000 for mortgage payments on certain properties, and Mr. Tousignant contributed $50,000 to cover an interest payment to CapSource.[6]

In late July 2010, Ultimate Escapes determined that it had insufficient cash to meet payroll and vendor obligations due by August 6. Mr. Tousignant initially approached CapSource for funds to tide the company over until the merger closed, but CapSource refused. Mr. Tousignant also sought a cash advance from Club Holdings, which Club Holdings agreed to, but only if the loan was asset-backed. Ultimate Escapes first suggested giving Club Holdings a second mortgage on an Ultimate Escapes property at 1600 Broadway, New York, NY ("1600 Broadway"), and then considered a sale of Ultimate Escapes' Maui Wailea Elite property to Club Holdings for approximately $1 million. Neither of these proposed transactions panned out, and Ultimate Escapes and Club Holdings finally agreed on a sale of 1600 Broadway. The sale was expected to generate sufficient funds to cover Ultimate Escapes' immediate cash needs, but by August 5 it became apparent that there would be a shortfall of $115,000 due to unanticipated sale closing costs, specifically New York City taxes and condo fees.

As the additional $115,000 was necessary in order to make payroll on August 6, 2010, Mr. Tousignant negotiated with Mr. Estler from Club Holdings to develop another transaction – the August 6th Agreement – to cover the shorfall. The agreement provided that in exchange for $115,000, Ultimate Escapes would use its best efforts to: (1) negoti-

---

[6] 5/22/14 Tr. at 157-59; 5/23/14 Tr. at 102. Citations to "[date] Tr. at [page]" are to the hearing transcripts.

ate with CapSource for the sale of a certain CapSource-financed Maui property to Club Holdings, (2) secure an assignment and extension of leases on two other Maui properties, and (3) transfer 30 members (900 member nights) to carry the costs of the leases.

The Trustee contends that the paragraph of the August 6th Agreement in which Ultimate Escapes agreed to use its best efforts to transfer 30 members essentially transferred Ultimate Escapes' entire Membership List to Club Holdings. The paragraph at issue states as follows:

> 900 NIGHTS — 30 FTE Membership Transfers. UE [Ultimate Escapes] agrees that it shall work in good faith and provide its best efforts to contact and work with current members of UE Clubs (Premier, Signature, and Elite) in order to encourage members to transfer their respective memberships to CH [Club Holdings] immediately. Further, UE shall work with and provide its best efforts to CH to allow employees and representatives of CH to gain access to members of UE such that they may be informed as to the specific terms of CH membership. . . . UE agrees to provide its best efforts with regard to as many members as possible until such a time as membership nights, in aggregate, of no less than nine hundred (900) per annum have been agreed to by members transferring into CH memberships from UE. **UE hereby knowingly and voluntarily waives any restrictions contained in the MCA [Confidentiality Agreement] and LOI [Letter of Intent] that may be construed as limiting or inconsistent with the rights of CH under this Section. . . . UE shall in no way or manner hold CH liable for any actions with respect to the direct solicitation of its members as set forth herein** and CH reserves the right to accept any number of

member nights either over or above the nine hundred (900) set forth above in its sole and absolute discretion.[7]

The $115,000 that Ultimate Escapes received under the August 6th Agreement was a small sum of money against the backdrop of a multi-million dollar business, but it was absolutely necessary to allow the company to stay afloat. As described in some detail below, the August 6th Agreement was negotiated over the course of a few intense, frantic days for Ultimate Escapes.

### D. The Weekend of August 6

The parties worked on both the 1600 Broadway sale and the August 6th Agreement on Friday, August 6, but were not able to complete either transaction that day. Because neither transaction closed, Ultimate Escapes failed to make payroll due on that date. Mr. Tousignant sent an email to all employees Friday evening that described "a delay in processing payroll checks," before assuring employees that payroll would be made early the following week.[8]

At 7:09 p.m. on Friday, August 6, 2010, Mr. Estler emailed Mr. Tousignant a draft of the August 6th Agreement. Mr. Estler's accompanying email stated:

> Jim,
>
> The following agreement basically says we will provide $115,000 for you to provide best efforts to provide us the following 3 things:
>
> 1. Work with CapSource to sell Maui to us
> 2. Use best efforts to transfer 2 Maui leases to us
> 3. Work with us to transfer 10 member [sic] per home to help us carry costs
> 4. We both agree to waive nonsolicit and noncompete

---

[7] Ex. P-6; Ex. D-26 (emphasis added).
[8] Ex. P-119.

The $115,000 will approximately (the final number is still moving around . . . We just got another $500 bill from a HVAC contractor) provide the total to cover payroll as requested.

Pete[9]

Discussions about closing the 1600 Broadway sale and the potential merger between Ultimate Escapes and Club Holdings continued throughout the weekend. A steady stream of email communications was exchanged as Ultimate Escapes' leadership struggled to keep Ultimate Escapes afloat in the short term and figure out a comprehensive solution for the long term.[10]

On Saturday, August 7, Mr. Tousignant spent the day interviewing restructuring consultants. Though Ultimate Escapes was still hopeful about the merger with Club Holdings, it was also exploring the prospect of a standalone financing or debt restructuring.[11] CRG Partners ("CRG") was ultimately selected as the restructuring consultant and Sheon Karol from CRG was appointed chief restructuring officer. CRG began working with Ultimate Escapes the week of August 9.[12]

At 7:03 a.m. on Sunday, August 8, Mr. Tousignant sent an email to Mr. Estler and Mr. Preiser, copying Mr. Sparks and Mr. Callaghan:

Pete and Alex,

With both the purchase at 1600 Broadway and the Maui leases, we should provide for a 90 day period of transition for our UE members in the event we don't close the merger, as we need time to make alternate arrangements for members in other properties and dates. This is a reasonable request, as we don't want to start creating member service interruptions while we are still trying to close our deal. The purchase contract and

---

[9] Ex. P-3.
[10] Ex. D-114; Ex. D-5; Ex. D-36; Ex. D-23; Ex. D-24; Ex. D-25.
[11] See Ex. D-38; Ex. P-91; 5/23/14 Tr. at 143
[12] Ex. P-37.

lease buyout terms can simply provide that UE has continued access for a period [of] 90 days after closing or assignment of lease. Hopefully none of this will matter and closing our deal will make all this moot.

Thanks,

Jim[13]

Mr. Estler responded that Club Holdings did not want to be liable for three months of rent if Ultimate Escapes filed bankruptcy or went in a direction other than merging with Club Holdings.[14] Mr. Tousignant replied Sunday at 10:15 a.m., reiterating the Debtors' commitment to the ongoing merger process:

Pete,

I understand and I am sure Alex [Preiser] and Jeff [Sparks] will work out the details in a way that works. Also our focus is getting our deal done, not BK or dating another pretty girl. We like the pretty girl we are engaged to now.

Warm regards,

Jim[15]

On Sunday afternoon, at 2:44 p.m., Mr. Estler emailed Mr. Tousignant a revised version of the August 6th Agreement.[16] Then at 7:04 p.m. on Sunday, Mr. Sparks requested a copy of the August 6th Agreement,[17] and Mr. Tousignant forwarded him the latest version at 7:18 p.m.[18] Mr. Sparks expressed some concerns about the August 6th Agreement,[19] to which Mr. Tousignant responded at 2:11 a.m. on Monday, August 9:

[13] Ex. P-47.
[14] Ex. P-47.
[15] Ex. P-47.
[16] Ex. P-122.
[17] Ex. P-55.
[18] Ex. P-122.
[19] Ex. P-55.

Redline to remove some of the more difficult language and send me a redline to review before sending to Alex [Preiser]. We can certainly make some reference to reasonable commercial efforts on the memberships. When we talk to Walter [Schuppe, the CapSource loan officer] tomorrow at 8:30am [*sic*], we will ask for an immediate $345k advance tomorrow to cover payroll. This will be a good test and, as you say, keep the pressure on Walter. With a CRO on board Monday or Tuesday, we will request a larger advance later in the week to cover other payables. Also, if we can show CH [Club Holdings] we don't need their cash (in the short-term) it gives us some leverage.[20]

However, the record does not reflect that Mr. Sparks emailed a redline of the document or provided one when he met Mr. Tousignant at the Ultimate Escapes' office Monday morning. At 8:30 a.m. on Monday, August 9, 2010, Mr. Sparks and Mr. Tousignant had a phone call with Mr. Schuppe from CapSource and made one last request for funding, which was denied. Mr. Tousignant thereafter signed the August 6th Agreement, which was scanned and emailed to Mr. Estler. While Mr. Sparks and Mr. Tousignant were at the Ultimate Escapes office in Florida on Monday, August 9, Mr. Keith was at the Club Holdings office in Colorado for the closing of the 1600 Broadway sale.

Once both transactions closed, money flowed from Club Holdings to Ultimate Escapes. Payroll checks were issued to employees on the afternoon of Monday, August 9.

### E. The Solicitation Provision in the August 6th Agreement

In conjunction with the transfer of the two Maui leases under the August 6th Agreement, the agreement provided that Ultimate Escapes would use its best efforts to transfer 30 members to Club Holdings to carry the costs of these leases. Mr. Tousignant testified credibly at trial that it was customary in the industry to aim to occupy a new property

---

[20] Ex. D-41.

with 10 members in order to have sufficient income to pay property operating costs.[21] The membership transfer paragraph reads in relevant part as follows:

> 900 NIGHTS — 30 FTE Membership Transfers. . . . UE agrees to provide its best efforts with regard to as many members as possible until such a time as membership nights, in aggregate, of no less than nine hundred (900) per annum have been agreed to by members transferring into CH memberships from UE. UE hereby knowingly and voluntarily waives any restrictions contained in the MCA [Confidentiality Agreement] and LOI [Letter of Intent] that may be construed as limiting or inconsistent with the rights of CH under this Section. . . . UE shall in no way or manner hold CH liable for any actions with respect to the direct solicitation of its members as set forth herein. . . .[22]

The last line of the membership transfer paragraph states that Ultimate Escapes will not hold Club Holdings liable for soliciting and gaining more than 30 members (the "Solicitation Provision"), but Mr. Tousignant testified credibly that he viewed the waiver of the Confidentiality Agreement to be in the context of the transfer of 30 members, and that the nonsolicitation waiver was broadly worded because it was anticipated that it would be difficult to transfer exactly 30 members:

> [B]ecause of the way our plans worked, we had four different membership plans: Fourteen-day plan which was two weeks; twenty-one-day plan which was three weeks; a twenty-eight-day plan which was four weeks; and a forty-two-day plan which was six weeks.
>
> So in essence, it was very unlikely, since we didn't have thirty-day plans, that we would just get 30 members to convert. So, for example, this could have

---

[21] 5/23/14 Tr. at 134.
[22] Ex. P-6; Ex. D-26.

been satisfied with as little as I believe 21 or 22 of our platinum members, which were forty-two-day plans. So the idea here was knowing that we probably wouldn't get an exact count, and again, you see language above that that says our best effort would stop once we achieved or exceeded 900.

And so our absolute understanding was this was a limited effort on our part to encourage members to move to a Club Holdings agreement and to pay dues, and the dues would cover the operating costs, and that that express right and obligation would end at around 900 members. But if in fact they got 906 member nights or 908 member nights, that would be allowed.[23]

In the ensuing weeks, questions started arising about the August 6th Agreement, and on September 1, 2010, Mr. Tousignant sent an email to Mr. Sparks, stating, "[D]idn't you circulate the [August 6th] agreement to the full Board, including Rich [Keith]?"[24] Mr. Sparks emailed in response, "No. It didn't fall within the approval authority for the Board."[25]

## F. The Club Holdings Solicitation

In late August, CRG began marketing the company. On September 13, 2010, CRG created a summary of the marketing prospects for Ultimate Escapes, showing high interest from eight companies. Around that time, prospects for an Ultimate Escapes-Club Holdings merger were bleak but still alive. On September 14, however, a CRG representative accidentally sent an email to Mr. Preiser at Club Holdings that discussed potential bidders for Ultimate Escapes' assets and indicated that the "[g]ap was narrowing on Club [Holdings] deal but Club [Holdings] just went the wrong way and CS [CapSource] is digging in."[26]

---

[23] 5/23/14 Tr. at 111.
[24] Ex. P-131.
[25] Ex. P-131.
[26] Ex. D-227.

On September 16, presumably alerted by CRG that its merger prospects had dimmed considerably, Club Holdings executed a mass solicitation of all Ultimate Escapes members.[27] Later that day, Ultimate Escapes, through its outside counsel at Greenberg Traurig, sent a cease-and-desist letter to Mr. Estler.[28] Club Holdings responded with a letter on September 17, pointing to the Solicitation Provision in the August 6th Agreement as justification for a mass solicitation.

## G. The Bankruptcy

Ultimate Escapes' bankruptcy filing on September 20, 2010 was, in part, motivated to stop the solicitation of its members. On September 21, 2010, Ultimate Escapes filed a motion [Docket No. 17] to reject the August 6th Agreement as an executory contract and requested a temporary restraining order (TRO) enjoining the solicitation of Ultimate Escapes members by Club Holdings. The Court entered an order [Docket No. 126] granting the motion to reject on October 7, 2010, but the Court denied the request for a TRO.

On October 25, 2010, the Court entered an order [Docket No. 396] approving certain asset purchase agreements entered into by Ultimate Escapes. CapSource agreed to purchase a majority of Ultimate Escapes' real estate assets with a credit bid of $52 million. Demeure purchased ten properties, Ultimate Escapes' intellectual property, and the right to solicit members for $14.3 million. Finally, two properties were sold to Ultimate Escapes members for $4 million.

On December 8, 2011, the Court entered a confirmation order [Docket No. 935], confirming the Debtors' modified second amended plan of reorganization (the "Plan") [Docket No. 936]. The Plan created the UE Liquidating Trust, to which the Debtors transferred all of their assets, including litigation claims. Per the terms of the UE Liquidating Trust, the Trustee is authorized to sue on behalf of the Trust, and based on such authority, has asserted the claims in this adversary proceeding. The Trustee filed the Complaint on September 19, 2012. Mr. Tousignant filed his answer [Docket No. 8] on December 28, 2012, and Mr. Keith

---

[27] *See* Ex. P-11.
[28] Ex. P-13.

filed his answer on May 7, 2013 [Docket No. 68]. Trial was held on May 21, 22, and 23, with closing arguments held on July 16, 2014.

## II. THE PARTIES' POSITIONS

### A. The Trustee's Position

The Trustee argues that the Defendants are liable for separately and independently breaching their fiduciary duties of care, loyalty, and good faith. The gist of the Trustee's argument is that Defendants were grossly negligent in entering into the August 6th Agreement, were motivated by their own self-interests rather than the best interests of Ultimate Escapes, and that the agreement was an irrational waste of corporate assets. The Trustee alleges that these facts rebut the presumption that the business judgment rule applies and that the Court should apply either of the two other standards of review—entire fairness or enhanced scrutiny.

### B. The Defendants' Position

Mr. Tousignant argues that he acted in good faith and with undivided loyalty when he entered into the August 6th Agreement, and that it was in the best interest of Ultimate Escapes creditors and shareholders. Mr. Tousignant states that his conduct is protected by the business judgment rule as the August 6th Agreement clearly served a rational business purpose. Mr. Keith contends that he was not involved in the direct negotiations leading to the August 6th Agreement, never reviewed it, and did not sign it. Mr. Keith does concede that he was generally aware of how Ultimate Escapes was going to cover its $115,000 shortfall, but that his direct role was limited to the sale of 1600 Broadway. Finally, both Defendants contend that nothing in the record supports a finding that they have breached their duty of loyalty to the Debtors.

## III. JURISDICTION AND VENUE

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b), with the Court determining that this matter is "related to" the Debtor's Chapter 11 case. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. This adversary proceeding constitutes a

non-core proceeding under 28 U.S.C. § 157(c). As such, and in accordance with Fed. R. Bankr. P. 9033(a), the Court herewith files its proposed findings of fact and conclusions of law.

## IV. DISCUSSION

The issue before the Court is whether Defendants breached their fiduciary duties when Ultimate Escapes entered into the August 6th Agreement, an agreement that provided the company with critical financing in the face of an otherwise immediate bankruptcy filing. This factual context does not relieve the Defendants of their responsibilities to both creditors and shareholders, but is instructive because the challenged transaction will "not judged by hindsight . . . [but] must stand or fall based on what the[] [corporate fiduciaries] knew and did at the time." *Chen v. Howard-Anderson*, 87 A.3d 648, 665 (Del. Ch. 2014).

### A. Breach of Fiduciary Duty Claims

Breach of fiduciary duty claims are evaluated under well-established standards of conduct and review. *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 35 (Del. Ch. 2013). "The standard of conduct describes what directors are expected to do and is defined by the content of the duties of loyalty and care. The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct. It describes what a plaintiff must first plead and later prove to prevail." *Id.* at 35-36; *see also In re Orchard Enterprises, Inc. Stockholder Litigation*, 88 A.3d 1, 33 (Del. Ch. 2014).

Regardless of whether the accused is an officer or director, both owe a duty of care and duty of loyalty to the corporation and shareholders. *Gantler v. Stephens*, 965 A.2d 695, 709 (Del. 2009). The Delaware Supreme Court has not decided what standard of review must be applied when evaluating a breach of fiduciary action against an officer.[29] The Court will review and apply each standard to the conduct alleged.

---

[29] "The Delaware Supreme Court has not addressed the standard of review that a court should use when evaluating officer decision making. A lively debate exists regarding the degree to which decisions by officers should be examined using the same standards of review developed for directors." *Chen v. Howard-Anderson*, 87 A.3d 648, 666 n.2 (Del. Ch. 2014) (citing Lawrence A. Hamermesh & A. Gilchrist Sparks III, *Corporate Officers and the Business Judgment Rule: A Reply to Professor Johnson*, 60 Bus. Law.

## B. Judicial Standard of Review

There are three tiers of review when evaluating corporate fiduciary decision-making: the business judgment rule, enhanced scrutiny, and entire fairness. *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). The applicable standard turns on whether the corporate fiduciaries

> (i) were disinterested and independent (the business judgment rule), (ii) faced potential conflicts of interest because of the decisional dynamics present in particular recurring and recognizable situations (enhanced scrutiny), or (iii) confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority (entire fairness).

*Trados*, 73 A.3d at 36.

### 1. Business Judgment Rule

The default standard is the business judgment rule. *See, e.g., In re NewStarcom Holdings, Inc.*, 514 B.R. 394, 400 (Bankr. D. Del. 2014). It is not only a rule, but a presumption that the directors of a corporation acted "independently, with due care, in good faith, and in the honest belief that their actions were in the stockholders' best interests." *Williams v. Geier*, 671 A.2d 1368, 1376 (Del. 1996); *Reis*, 28 A.3d at 457. When the business judgment rule applies, "the board's decision will be upheld unless it cannot be attributed to any rational purpose." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 74 (Del. 2006) (internal quotation marks omitted).[30]

---

865 (2005); A Gilchrist Sparks, III & Lawrence A. Hamermesh, *Common Law Duties of Non-Director Corporate Officers*, 48 Bus. Law. 215 (1992); Lyman P.Q. Johnson, *Corporate Officers and the Business Judgment Rule*, 60 Bus. Law. 439 (2005)).

[30] A court reviews directors' decisions "not for reasonableness but for rationality. If those conditions to the application of the standard are met, however, it is as a practical matter impossible that the resulting decision can be found irrational." William T. Allen, Jack B. Jacobs, Leo E. Strine, Jr., *Function over Form: A Reassessment of Standards of Review in Delaware Corporation Law*, 56 Bus. Law. 1287, 1298 (2001).

### 2. Enhanced Scrutiny

Enhanced scrutiny, an intermediate standard of review, "applies to specific, recurring, and readily identifiable situations involving potential conflicts of interest where the realities of the decisionmaking context can subtly undermine the decisions of even independent and disinterested directors." *Trados*, 73 A.3d at 43. Circumstances triggering enhanced scrutiny include a change of control, a hostile takeover, a proxy context, final stage transactions, and "situations where the law provides stockholders with a right to vote and the directors take action that intrudes on the space allotted for stockholder decision-making." *Reis*, 28 A.3d at 457. "Inherent in these situations are subtle structural and situational conflicts that do not rise to a level sufficient to trigger entire fairness review, but also do not comfortably permit expansive judicial deference." *In re Rural Metro Corp.* 88 A.3d 54, 82 (Del. Ch. 2014).

### 3. Entire Fairness

The most rigorous standard of review, entire fairness, applies "when the board labors under actual conflicts of interest." *Trados*, 73 A.3d at 44; *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 642 (Del. 2014) (noting how a transaction that involves self-dealing by a controlling shareholder requires review under entire fairness). "A director's [conflict of] interest may be shown by demonstrating a potential personal benefit or detriment to the director as a result of the decision." *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004). The independence inquiry concerns "whether the director's decision is based on the corporate merits of the subject before the board, rather than extraneous considerations or influences." *Id.*

## C. Legal Analysis

The Trustee and the Defendants vigorously contest which standard of review the Court should apply. The Trustee contends that the Court should apply the entire fairness test because the Defendants were self-interested (or at the very least acted with divided loyalties) when entering into the August 6th Agreement. In the alternative, the Trustee

argues that enhanced scrutiny is appropriate because the sale of the membership information was a critical final step transaction related to the proposed merger with Club Holdings, and was hastily executed before a CRO took control of the company. The Defendants argue that they are entitled to the protections of the business judgment rule because the Trustee cannot prove that they violated their duty of loyalty or duty of care.

For the reasons that follow, the Court finds that the Trustee has not met the requirements under Delaware law to strip Mr. Tousignant of the protections of the business judgment rule, and the Court further finds that entering into the August 6th Agreement was frankly consistent with Ultimate Escapes' interest in progressing toward the proposed merger with Club Holdings. As to Mr. Keith, the Court finds that there is no evidence he had actual knowledge of the terms of the August 6th Agreement as he did not sign the agreement and the record reflects that it was negotiated and executed without his or full board approval.

### 1. Mr. Tousignant's Actions Are Protected by The Business Judgment Rule

In order to defeat the presumption that the business judgment rule applies, the Trustee must point to "sufficient facts to support a reasonable inference" that the decision to enter into the August 6th Agreement was a breach of Tousignant's duty of loyalty[31] or duty of care. *In re Autobacs Strauss, Inc.*, 473 B.R. 525, 562 (Bankr. D. Del 2012). If the Trustee "proves facts sufficient to overcome the business judgment rule, 'the burden then shifts to the director defendants to demonstrate

---

[31] The Delaware Supreme Court has held that "a shareholder plaintiff assumes the burden of providing evidence that directors, in reaching their challenged decision, breached any one of the *triads* of their fiduciary duty — good faith, loyalty or due care." *Cede v.Technicolor*, 634 A.2d 345, 361 (Del. 1993). But more recently, the court clarified that the duty of good faith is only a "subsidiary element" or "condition[] of the fundamental duty of loyalty." *Stone ex rel.AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (noting further that "although good faith may be described colloquially as part of a "triad" of fiduciary duties that includes the duties of care and loyalty, the obligation to act in good faith does not establish an independent fiduciary duty that stands on the same footing as the duties of care and loyalty").

that the challenged act or transaction was entirely fair to the corporation and its shareholders.'" *Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006)). Or, "if the Court finds facts evidencing disloyalty by the defendant, the business judgment rule is rebutted, and the Court reviews the transaction to determine whether . . . the transaction is nevertheless entirely fair to the Company's shareholders." *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1178 (Del. Ch. 1999) (citations omitted), *aff'd*, 766 A.2d 437 (Del. 2000).

The Court finds that Tousignant is entitled to the protection of the business judgment rule because the record does not contain facts to support a reasonable inference that Tousignant was either interested in the transaction or failed to adequately inform himself prior to entering into the agreement. Before evaluating the challenged conduct against the business judgment rule's "rational purpose" test, the Court will first address the Trustee's specific allegations.

## 2. The Evidence Does Not Support a Breach of the Duty of Loyalty

The duty of loyalty requires that a corporate fiduciary act with "undivided and unselfish loyalty to the corporation" and that "there shall be no conflict between duty and self-interest." *Weinberger v. UPO, Inc.*, 457 A.2d 701 (Del. 1983); *Stone ex rel.AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (discussing how loyalty requires a director to "act[] in the good faith belief that her actions are in the corporation's best interest") (internal citation omitted). A director is considered to be "interested" if he stands on both sides of the transaction or if he looks to derive personal financial benefit from the transaction. *Asarco LLC v. Americas Mining Corp.*, 396 B.R. 278, 405 (S.D. Tex. 2008). The duty of loyalty requires that a corporate fiduciary put the best interests of the corporation and its shareholders before any interest possessed by the fiduciary that is not shared by the shareholders generally. *Creditors' Comm. of Starr Telecomm., Inc. v. Edgecomb*, 385 F. Supp. 2d 449, 460 (D. Del. 2004).

The Trustee argues that Tousignant did not act with honesty of purpose and had divided loyalties when he executed the August 6th Agreement. The Trustee identifies three main reasons why Tousignant was interested in the August 6th Agreement: first, he wanted to protect his equity in the company; second, he had an economic interest in avoiding a default and possible bankruptcy; and third, he wanted to avoid criminal liability under the law associated with failing to timely pay employee wages. The Trustee also alleges that the sale of the Membership List was effectively a waste of corporate assets. As discussed below, the Court finds that the evidence does not support a breach of the duty of loyalty. Also discussed herein, the Court believes that it is inappropriate to apply the Trustee's favored standards of review — entire fairness and enhanced scrutiny — to the transaction because it has not been shown that Tousignant put any "potential personal benefit[s]" ahead of the "corporate merits of the [challenged] transaction," *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del. 2004), and because the August 6th Agreement was not a transaction related to a sale such "that a fundamental change of control occurs or is contemplated." *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 46 (Del. 1994).

### i. Tousignant Was Not Motivated By Self-Interest

Addressing the Trustee's first argument, the Court is persuaded that Tousignant had every incentive and every right to endeavor to protect his equity in the company. The Court finds instructive Vice Chancellor Laster's remarks in *Chen v. Howard-Anderson*:

> Delaware law presumes that investors act to maximize the value of their own investments. When directors or their affiliates own material amounts of common stock, it aligns their interests with other stockholders by giving them a motivation to seek the highest price and the personal incentive as stockholders to think about the trade off between selling now and the risks of not doing so. If the decision is made to sell, a director who is also a shareholder of his corporation is more likely to

> have interests that are aligned with the other share-
> holders of that corporation as it is in his best interests,
> as a shareholder, to negotiate a transaction that will re-
> sult in the largest return for all shareholders.

87 A.3d 648, 670-71 (Del. Ch. 2014); *see also In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573 (Del. Ch. 2010).

     Second, with respect to Tousignant's alleged economic incentives, the Court finds that he did not receive "a personal benefit from the transaction which is not equally shared by the stockholders" when he entered into the August 6th Agreement. *Rales v. Blasband*, 634 A.2d 927, 933 (Del. 1993). The benefits the Trustee cites include Tousignant's personal guarantees on certain real estate assets held by Ultimate Escapes; the $50,000 personal advance made by Tousignant on behalf of the company; the $89 million personal indemnity guarantee that would be triggered by a bankruptcy filing; and finally, the potential loss of his employment compensation. The record in this case is clear on at least one point—Ultimate Escapes' Outside Directors and counsel believed that the best result for all stakeholders, including shareholders, was to continue along the path to a Club Holdings merger.[32] Tousignant's decision to enter into the August 6th Agreement was simply an act in furtherance of this transaction, seen at that moment as the best possible outcome for the company. Nevertheless, it is not at all clear that Tousignant would have been able to escape from under his personal guarantee if a merger was consummated.[33] Moreover, multiple witnesses rejected the proposition that Tousignant had personally profited or realized any pecuniary gain from the August 6th Agreement.[34] Contrary to the Trustee's allegations, there is no evidence that Tousignant's decision to enter into the August 6th Agreement was based on "extraneous considerations or influences," *Beam*, 845 A.2d at 1049, or that

---

[32] Sparks Dep. at pp. 59-60; Frantz Dep. at pp. 24, 46; McMillen Dep. at pp. 131-32, 141.
[33] It also appears that Tousignant would likely have been required to personally guarantee the debt of the combined company if Club Holdings and Ultimate Escapes ultimately merged. *See* Ex. D-68; Ex. D-72; Ex. D-76.
[34] Schuppe Dep. at pp. 239; Sparks Dep. at pp. 134; Griessel Dep. at pp. 152; Frantz Dep. at pp. 57; Wolf Dep. at pp. 100.

Tousignant "intentionally act[ed] with a purpose other than that of advancing the best interests of the corporation." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. 2006). For these reasons, the Court finds that Tousignant did not breach his duty of loyalty on "best interest" grounds.

Third, the Trustee's allegation that Tousignant suffered from a conflict of interest because he did not want to face criminal liability for missing payroll is also attenuated. Other than a single mention of the statutory obligation to pay employees,[35] there is simply no evidence to support the Trustee's contention that Mr. Tousignant's actions were driven by naked self-preservation. Instead of evidencing divided loyalty, a more plausible explanation exists. Tousignant's unrebutted and credible testimony at trial reflected legitimate concern about the need to keep the company afloat and to avoid having to notify the employees and the public of the missed payroll in the company's filings with the Securities and Exchange Commission. This disclosure would have had a damaging effect on Ultimate Escapes business and put the proposed merger with Club Holdings at risk. This scenario was discussed in a meeting of the Ultimate Escapes audit committee on August 6.[36] It was also the subject of email communication between various members of Ultimate Escapes' board and management on August 7, 2010.[37] In light of these concerns, the Court finds that Tousignant's decision to enter into the August 6th Agreement and thereby make payroll upheld his corporate responsibility to affirmatively "protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation." *Guft v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

The Court also finds that there is no evidence that Tousignant was on both sides of the August 6th Agreement and that he put any "potential personal benefit[s]" ahead of the "corporate merits of the [challenged] transaction." *Beam v. Stewart*, 845 A.2d 1040, 1049 (Del.

---

[35] Sparks. Dep. at pp. 40
[36] Ex. P-8.
[37] Ex. D-114.

2004). In light of this conclusion, the Court finds that entire fairness is not the applicable standard of review for the challenged transaction and therefore the Court need not delve into an inquiry as to whether the transaction was objectively "the product of fair dealing and fair price." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013).

### ii. The August 6th Agreement Was Not A Waste of Corporate Assets

Next, the Trustee contends that the sale of Ultimate Escapes' "crown jewel" membership information to Club Holdings pursuant to the August 6th Agreement requires enhanced scrutiny. Enhanced scrutiny is triggered by a change in control or other final stage transaction where "there is the danger that top corporate managers will . . . prefer a sale to one industry rival rather than another for reasons having more to do with personal ego than with what is best for stockholders." *In re Trados*, 73 A.3d at 44 (citation omitted). To rebut an allegation that enhanced scrutiny applies "defendant fiduciaries 'bear the burden of persuasion to show that their motivations were proper and not selfish' and that 'their actions were reasonable in relation to their legitimate objective.'" *Id.* (quoting *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 810 (Del. Ch. 2007)). Reasonableness is the key inquiry; a court "should be deciding whether the directors made a reasonable decision, not a perfect decision." *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1033 (Del. Ch. 2012). "[T]he reasonableness standard requires the court to consider for itself whether the board is truly well motivated (i.e., is it acting for the proper ends?) before ultimately determining whether its means were themselves a reasonable way of advancing those ends." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

By its terms, the August 6th Agreement did not effectuate a change of control, is not a merger agreement, a final stage transaction, or any of the "specific, recurring, and readily identifiable situations" in which courts apply enhanced scrutiny. *Trados*, 73 A.3d at 43. Case law in this area often focuses on situations where "directors take action that intrudes on the space allotted for stockholder decision-making." *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). But, this is

not such a case. No party alleges that the August 6th Agreement required shareholder approval. Nor could they, as the agreement was executed by an officer of a corporation pursuant to his authority to transact on behalf of the company. Additionally, it is undisputed that Tousignant, Ultimate Escapes' CRO, other officers and Outside Directors, the company's secured lender CapSource, and potential merger partner Club Holdings continued negotiating for weeks after the August 6th Agreement was executed.[38] The Court finds that applying enhanced scrutiny to the challenged action under these circumstances is inappropriate.

Despite this being an atypical case for enhanced scrutiny, the Trustee argues that the standard is appropriate as the August 6th Agreement constituted corporate waste because the company's membership information was sold for disproportionately small consideration. "To prevail on a waste claim . . . the plaintiff must overcome the general presumption of good faith by showing that the board's decision was so egregious or irrational that it could not have been based on a valid assessment of the corporation's best interests." *Kaufman v. Allemang*, 2014 WL 4954333, at *10 (D. Del. Sept. 30, 2014).[39]

The record does not support the conclusion that Tousignant acted in such a manner. First, the Court is not convinced that the August 6th Agreement constituted a sale of the company's membership information or membership list, since the Debtor was ultimately able to sell certain properties and its membership list in bankruptcy for approximately $14 million. Second, nowhere in the agreement does it discuss the sale of an asset, either tangible or intangible. Instead, it only modi-

---

[38] *See e.g.,* Ex. P-100 (Board minutes of Aug. 20, 2010 Ultimate Escapes special restructuring committee, during which CRO Sheon Karol discussed the sale/financing process, frustration with CapSource not advancing funds, merger updates and bankruptcy preparations); Ex. D-218 (Sept. 15, 2010 email from Pete Estler to CapSource and numerous individuals at Ultimate Escapes with the subject line "CapitalSource Terms form Club Holdings/Ultimate Escapes"). The Court takes note of the fact that Ultimate Escapes filed for bankruptcy four days after Estler's email was sent, evidence that the parties were engaged right up to the end.

[39] Good faith is no longer a separate fiduciary duty but instead is a "subsidiary element" or "condition" of the duty of loyalty. *Supra* note 32.

fies the confidentiality restrictions in the parties' mutual confidentiality agreement and letter of intent. Therefore, contrary to the Trustee's belief that the August 6th Agreement constituted a sale, it is more reasonable and consistent with the evidentiary record to interpret the August 6th Agreement as providing only for a limited solicitation of members.

Looking at the August 6th Agreement as a whole, it is understandable that the parties would need to modify confidentiality restrictions to allow for the transfer of members to support the cost of the transferred leased properties. Otherwise, Club Holdings would have taken on the lease liability without any stream of revenue to pay the operating costs. In the email from Pete Estler, CEO of Club Holdings, to Tousignant on Friday August 6, 2010 that outlined the contours of the agreement, Estler confirms this point when he wrote that Ultimate will work with Club Holdings to "transfer 10 members per home to help us carry costs."[40] Given competing interpretations of the contract, Estler's contemporaneous statements regarding the purpose behind this section of the August 6th Agreement are dispositive. The Court finds that Tousignant did not act in bad faith or engage in corporate waste when he entered into the August 6th Agreement. To find otherwise would require a finding that Tousignant transacted in an egregious or irrational manner or that the August 6th Agreement was "so far beyond the bounds of reasonable business judgment that its only explanation is bad faith." *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005). The record in this case simply does not support such a finding.

Having disposed of the Trustee's breach of loyalty claims, the Court addresses briefly the Trustee's argument that Tousignant breached his duty of care. The Trustee contends that Tousignant was grossly negligent, failed to adequately inform himself of the agreement's provisions, failed to seek the advice or approval of the board of

---

[40] Ex. D-180 (June 6, 2010 email from Estler to Tousignant).

directors or other outside advisors prior to entering into the agreement, and failed to prudently manage the Debtors' business operations.[41]

### 3. The Evidence Does Not Support a Duty of Care Violation

The duty of care requires that directors of a Delaware corporation (1) "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and (2) "consider all material information reasonably available." *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 564 (Bankr. D. Del. 2008) (*quoting In re Walt Disney Co. Deriv. Litig.* 906 A.2d 749 (Del. 2009). The failure to inform in a deliberate manner generally constitutes grossly negligent conduct for which a breach of the duty of care attaches. *In re Fedders North America, Inc.*, 405 B.R. 527, 539 (Bankr. D. Del. 2009). So long as a director or officer performed a reasonable investigation and acted in good faith, honest mistakes will not be penalized. *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

Based on the evidence presented at trial, the Court concludes that Tousignant did not breach his duty of care when he entered into the August 6th Agreement. As a baseline, the Court notes that Tousignant was vested with authority to operate the business generally. He also had authority—either apparent or actual—to enter into the August 6th Agreement as Ultimate Escapes board of directors "authorized and empowered" him in June 2010 "to take such action and to incur such expenses as is or may be reasonably necessary in connection with the consummation of the [Club Holdings merger] transaction."[42] With this authority, the record is clear that all parties worked diligently over the course of multiple months to close the merger transaction.

Tousignant and others were also very aware of Ultimate Escapes' dwindling liquidity.[43] In response, Tousignant made an interest

---

[41] Compl. ¶ 128.
[42] Ex. D-109 (June 10, 2010 minutes from Ultimate Escapes' board meeting).
[43] Ex. D-64 (July 23, 2010 email from Phil Callaghan to Alex Preiser and Pete Estler, noting that "My payables and HOA/Taxes, let alone payroll, *__are all at bursting point__* and virtually every [funding] prospect is waiting for "good news" before funding") (emphasis in original).

payment and Richard Keith made mortgage payments on behalf of the company.[44] These measures proved insufficient as Ultimate Escapes did not have the necessary funds to make payroll on August 6 and pay other urgent expenses.[45] To bridge this liquidity gap, Tousignant arranged for the sale of 1600 Broadway to Club Holdings, a sale that ultimately proved insufficient to meet the company's needs. At this point, contrary to the Trustee's allegation that Tousignant did not explore alternative financing options, the record details how Tousignant pursued various options before ultimately acquiescing to the August 6th Agreement.

First, Tousignant lobbied CapSource – the company's primary secured lender - who declined to offer any additional financing.[46] Tousignant then turned to Club Holdings, who tentatively agreed to buy two properties from Ultimate Escapes with Club Holdings "assuming both of the underlying mortgages with U[ltimate] E[scapes] receiving cash representing the equity."[47] CapSource, the mortgagee on one of the properties, rejected this transaction because it "would require a loan mod and other approvals, etc." and CapSource had all of their manpower committed to another deal.[48] Despite rejecting the sale transaction, CapSource suggested assigning or transferring Ultimate Escapes' ownership interest in certain properties to circumvent the need for CapSource approval.[49] Tousignant testified at trial that "we moved our attention to other alternatives, including assignment" after

---

[44] 5/22/14 Tr. at 157 (Richard Keith mentioning that he made two mortgage payments on behalf of Ultimate Escapes in the amount of $56,000 and $44,000, respectively); 5/23 Tr. at 102-103 (Tousignant noting that he contributed $50,000 to cover an interest payment to CapSource).
[45] Ex. P-8 (July 30, 2010 minutes from Ultimate Escapes' Audit Committee Meeting where the $1.6 million shortfall was discussed, including the need to sell property to cover); Ex. D-64 (July 22, 2010 email from UE SVP/CFO Callaghan to Walter Schuppe at CapSource in which Callaghan says "bottom line …we have zero cash and sales are few and far between); Ex. D-133 (July 29, 2010 email Phil Callaghan to Pete Estler noting that Ultimate Escapes needed $2,000,000 released from escrow to fund operations through the close of the merger).
[46] Schuppe Dep. at pp. 51-52; Sparks Dep. at pp. 42.
[47] Ex. D-134 (Aug. 1, 2010 email from Tousignant to CapSource loan officer).
[48] Ex. D-135 (Aug. 2, 2010 return email from CapSource to Tousignant).
[49] Id.

this suggestion.[50] Tousignant continued communicating with Cap-Source by email on August 2, discussing the possibility of a second mortgage on the property in Maui or providing Club Holdings with a lien on equity in Ultimate Escapes' holding company.[51] It is clear that Tousignant diligently pursued alternative sources of financing prior to entering into the August 6th Agreement.[52]

Moreover, upon receipt of the August 6th Agreement, Tousignant shared it with Phil Callaghan, CFO, and Jeff Sparks, General Counsel on Sunday, August 8, 2010.[53] While it is reasonable to ask why Tousignant waited until Sunday to share the agreement, the Court notes that Tousignant, Callaghan and Sparks worked throughout the weekend, interviewing restructuring consultants and finalizing all documents for the close of the sale of 1600 Broadway – the key generator of cash to satisfy the company's needs.[54] These responsibilities were equally as important to the company's survival and the Court does not draw any negative inference from the delayed communication.

Turning to whether board approval was necessary prior to entering into the agreement, the Court reiterates Tousignant's authority to transact on behalf of Ultimate Escapes in furtherance of the proposed Club Holdings merger pursuant to the June 2010 board minutes. Also relevant is Tousignant's view, as he testified at trial, that the company "had a very strict practice . . . typically governed by our counsel and financial executives as to whether in any given case [a transaction] required shareholder approval, board approval. And in this particular case, it was clearly in our minds something that was a fairly straight-

---

[50] 5/23/14 Tr. at 130.

[51] Ex. D-136 (Aug. 2, 2010 emails between CapSource and Tousignant).

[52] Ex. P-5 (Aug. 6, 2010 email from Tousignant to members of Ultimate Escapes board of directors, general counsel, and outside counsel that attached draft term sheet for a $15 million senior secured term loan from a third-party investment firm).

[53] Ex. D-41 (Aug. 9, 2010 emails from Tousignant to Callaghan asking for his interpretation of the agreement, and from Tousignant to Sparks asking him to redline the document to remove some of the more difficult language).

[54] Ex. D-24 (Aug. 8, 2010 emails between Tousignant, Callaghan, Sparks and COO Bob Glinka); Ex. D-37 (same); Ex. D-114 (Aug. 7. 2010 emails between Tousignant and members of Ultimate Escapes board of directors discussing the current state of negotiations of the Club Holdings merger and the missed payroll).

forward agreement and didn't require any notice, any approvals of any of those parties."[55] This view is supported by an email from Jeff Sparks to Tousignant in which Sparks noted that signing the agreement "didn't fall within the approval authority for the Board."[56] The record belies the Trustee's allegations that board approval was necessary prior to entering into the August 6th Agreement.

As to the Trustee's argument that Tousignant did not adequately inform himself of the substance of the August 6th Agreement, this too is contradicted by the record. The details of the lease/membership transfer transaction were communicated to Tousignant in an email from Pete Estler, CEO of Club Holdings on Friday August 6, 2010.[57] In the email, Estler stated that Ultimate Escapes was to use "best efforts" to transfer 30 members "to help us carry costs" associated with the properties noted in the agreement.[58] This statement comports with Tousignant's view that the August 6th Agreement only allowed for a limited solicitation of members. As Tousignant testified at trial, his understanding was that "the language [of the August 6th Agreement] was very expressly clear that we [Ultimate Escapes] were limiting this [membership transfer] to 900 member nights, or 30 FTE [full time equivalent] members, and again, solely with the objective, the need for Pete [Estler and Club Holdings] to have some income stream if he in fact pursued these [Maui] properties to pay the operating costs."[59] Regardless of the fact that Club Holdings eventually mass solicited Ulti-

---

[55] 5/23/14 Tr. at 91-92. *See also id.* at 77 (Tousignant mentioning how Ultimate Escapes did approximately 50 to 100 real estate transactions in a given year and that it was the responsibility of the company's CFO and General Counsel to discuss the transaction with the company's outside directors).

[56] Ex. D-47 (Sept. 1, 2010 email from Sparks to Tousignant in response to question from Tousignant as to whether Sparks circulated the agreement to the full board).

[57] Ex. P-3. In exchange for $115,000, Estler indicated that Ultimate Escapes and Club Holdings would mutually agree to waive employee non-solicitation and non-compete clauses and then Ultimate Escapes would use "best efforts" to: (i) work with Cap-Source to sell a Maui property to Club Holdings; (ii) transfer 2 Maui leases to Club Holdings; and (iii) transfer 10 members to Club Holdings per lease to defray the carry costs of the leases.

[58] *Id.*

[59] 5/23/14 Tr. at 110-113.

mate Escapes members in September (apparently in response to an inadvertent disclosure by CRG), the Court must focus what Tousignant "knew and did at the time of the time" of the challenged transaction. *Chen v. Howard-Anderson*, 87 A.3d 648, 665 (Del. Ch. 2014). Based upon this record, the Court finds that Tousignant's view of the August 6th Agreement is reasonable and that he was adequately informed at the time he entered into it.

The foregoing facts do not show that Tousignant was grossly negligent when he entered into the August 6th Agreement. To the contrary, the record is clear that Tousignant pursued various other alternatives, was in constant contact with Ultimate Escapes' officers and directors about the state of the company's affairs, pursued the challenged transaction in light of "all material information reasonably available," and acted with the honest belief that the agreement was the only means to provide Ultimate Escapes with the necessary infusion of cash that it so desperately required. The Court therefore is satisfied that Tousignant performed a reasonable amount of investigation, acted in good faith, and was sufficiently informed prior to entering into the August 6th transaction to defeat the Trustee's allegation of the breach of the duty of care.

### 4. Tousignant is Entitled to the Protections of the Business Judgment Rule

Having disposed of the Trustee's arguments that Tousignant breached his duties of loyalty and care, the Court must now apply the business judgment rule to the challenged conduct. The business judgment rule is a deferential standard; it "precludes judicial second-guessing so long as the board's decision 'can be attributed to any rational business purpose.'" *In re MFW Shareholders Litig.*, 67 A.3d 496, 526 (Del. Ch. 2013) (*citing Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)). A business decision is irrational when it "is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it.'" *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 43 n.18 (Del. Ch. 2013). Therefore, so long as a

transaction is lawful, "within the corporation's powers, authorized by a corporate fiduciary acting in good faith pursuit of corporate purposes," a breach of fiduciary action will not stand, "no matter how foolish the investment may appear in retrospect." *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996).

As discussed at length throughout this opinion, the purpose of the August 6th Agreement was clear—to provide Ultimate Escapes with a necessary cash infusion at a critical juncture. If the company failed to meet payroll and fund other expenditures, the evidence suggests that a bankruptcy filing was imminent, if not immediate. At the time Tousignant entered into the August 6th Agreement, his focus was on bridging this liquidity gap. Otherwise, a bankruptcy filing would have killed the merger with Club Holdings and wiped out all shareholders, including a number of corporate officers who had substantial "skin in the game."[60] Tousignant also pursued alternative avenues of financing in the days leading up to August 6, 2010, thereby defeating any argument that he was not informed or acted imprudently. Consistent with these facts and observations, as well as the analysis throughout this opinion, the Court finds that Tousignant's decision to enter into the August 6th Agreement is attributable to a rational business purpose.

Although Tousignant and others diligently worked to keep their company afloat, they were ultimately unsuccessful. As then-Chancellor Strine once stated, "[i]t is no doubt regrettable" that a company may file bankruptcy, but "the mere fact of a business failure does not mean that plaintiff can state claims against the directors, officers, and advisors on the scene just by pointing out that their business strategy did not pan out." *Trenwick America Litig. Trust v. Ernst & Young*, 906 A.2d 168, 193 (Del. Ch. 2006). Instead, the law fosters a balance between "promoting good-faith risk taking and in preventing fiduciary misconduct." *Id.*

---

[60] Sparks Dep. at pp. 72-73 (discussing how it was Walter Schuppe from CapSource who wanted Ultimate Escapes' officers and directors to have "skin in the game" to ensure that they were acting in good faith).

### 5. The Evidence Does Not Support a Finding that Mr. Keith Breached His Fiduciary Duties

Finally, the Trustee alleges that Mr. Keith breach his fiduciary duties to the company because of his involvement with the August 6th Agreement. The Court finds that there is no evidence that Mr. Keith had actual knowledge of the terms of the August 6th Agreement, nor did he sign the agreement and the record reflects that it was negotiated and executed without his or full board approval. Absent contradictory evidence, the Court finds that Mr. Keith did not breach his fiduciary duties to Ultimate Escapes' creditors and shareholders.

## V. CONCLUSION

For the foregoing reasons, this Court recommends that the reviewing court find and conclude that the business judgment rule applies and that Defendants did not breach their fiduciary duties.

**BY THE COURT:**

Dated: February 5, 2015
Wilmington, Delaware

Brendan Linehan Shannon
Chief United States Bankruptcy Judge